Search

# THE ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK

## FORMAL OPINION 1996-3

### COMMITTEE ON PROFESSIONAL AND JUDICIAL ETHICS

April 2, 1996

ACTION: FORMAL OPINION

**TOPIC:** Conflicts of Interest; Lawyers Representing Adversary Lawyers.

OPINION:

DIGEST: Whether a lawyer may undertake the representation of, or whether a lawyer may retain, an adversary attorney, with or without the consent of the clients being represented by the respective attorneys, depends upon an analysis of the particular facts and circumstances, including: (a) the intensity and duration of the relationship between the adversaries; (b) the intensity and duration of the adversaries' relationships with their respective clients; (c) the nature of the lawyer-lawyer representation; (d) the nature of the work currently being performed by the lawyers for their respective clients; (e) the relationship, if any, between the lawyer-lawyer representation and the representation of either client; and (f) the relative importance of the representations to the respective lawyers or firms.

CODE: DRs 5-101(A), 5-105, 5-105(C); ECs 2-8, 4-2, 5-1, 6-3, 7-8.

NOTE: Modifies N.Y. City 502 (1939); N.Y. City 307 (1934).

QUESTIONS

May a Lawyer, "L," undertake the representation of another lawyer, "C," as a client, when C and L are representing adversary parties in an unrelated litigation? Conversely, may C engage L as an attorney when C and L are representing adversary parties in an unrelated litigation?

QUOTATION

"Sometimes even lawyers need lawyers."

Former "First Brother" Billy Carter. n1>FTNT>

n1 A Dictionary of Legal Quotations � 88.13 at 103 (S. James & C. Stebbings eds. 1987).>ENDFN>

OPINION

Introduction

Frequently, lawyers seek out other lawyers to represent them, including in the following situations:

Lawyers as People. Lawyers often require the assistance of counsel in their personal affairs. Whether for convenience, or because of a lack of expertise or confidence in the ability to handle the matter pro se, lawyers regularly hire other lawyers to represent them in matters having nothing to do with the area in which they practice or with the "business" of practicing law. Thus, whether in the purchase or sale of a residence, in domestic relations matters, in estate planning matters or for a variety of other reasons, lawyers often hire other lawyers to provide them with professional services in their individual, private capacities.

Lawyers in Their Business Dealings. Lawyers also routinely retain outside counsel to represent them in their business affairs. The practice of law has become a highly competitive business. A lawyer is as much in need of the full range of legal services as any other business-person. Issues of partnership taxation, real estate leasing, disputes with vendors and employment litigation are just a few of the business-related matters on which a firm may seek legal guidance. Similarly, outside counsel is often employed to assist in intra-firm disputes, such as litigation arising out of the departure of partners and associated financial and client solicitation issues. While some large law firms may well be able to find this expertise in-house, they also occasionally seek outside advice in complex financial or commercial matters or when other circumstances warrant.

Lawyers in Need of Professional Guidance. Lawyers also hire other lawyers when they confront professional quandaries such as client perjury or fraud and other confidentiality concerns, conflicts of interest, and attorney-client disputes. Whether in matters that may give rise to substantial financial exposure or otherwise, the outside counsel they select may be another lawyer in the field or a distinguished ethicist from whom a formal opinion is sought.

Lawyers in Trouble. Law firms ordinarily seek outside counsel in times of crisis, such as when charged with malpractice by clients or misconduct by regulatory agencies. Correspondingly, when a lawyer is charged with a disciplinary violation, the lawyer or the firm may well retain an expert in such matters either to appear as an advocate or to assist through counselling and guidance. Indeed, because most lawyers do not handle such matters on a regular basis, they are more inclined to retain outside counsel given that catastrophic sums of money, their invaluable reputation, or their very right to practice law may be at risk.

Overview of Ethical Principles

Various ethical principles are implicated by the retention of lawyers in these factual contexts. For example, by virtue of the need to preserve the confidentiality of information provided by a client to a lawyer, it is generally impermissible to retain or consult with counsel in client-related matters without the client's consent. n2 Additional complications may arise when the hiring lawyer intends to divide the fee for the matter with the retained counsel. These issues, though of great importance, are ordinarily resolved without significant analytical difficulty. This opinion will focus, instead, on a problem that may well give rise to analytical difficulties in certain contexts and that may, unlike associating with an "expert" or dividing a fee, often be perplexing.>FTNT>

n2 See EC 4-2 ("In the absence of consent of his client after full disclosure, a lawyer should not associate another lawyer in the handling of a matter; nor should he, in the absence of consent, seek counsel from another lawyer if there is a reasonable possibility that the identity of the client or his confidences or secrets would be revealed to such lawyer."); EC 6-3 ("A lawyer offered employment in a matter in which he is not and does not expect to become [competent] should either decline the employment or, with the consent of his client, accept the employment and associate a lawyer who is competent in the matter." (Emphasis supplied.)). Cf. Davis v. York Int'l Corp., Civil Action No. HAR 92-3545, slip op., *1993 U.S. Dist. LEXIS 7137* (D. Md. May 24, 1993) (lawyer lecturing in continuing legal education course did not enter into attorney-client relationship with client of student in course who asked a question regarding a pending matter).>ENDFN>

In resolving any ethical quandary, just as in addressing any other legal problem, a critical step is identifying the issue. Authorities have differed as to the nature of the perceived conflict of interest when a lawyer hires an adversary to provide legal services, and generally choose one of two models.

The first model precludes lawyers from representing a client whose interests conflict with or differ from those of another client of the lawyer. DRs 5-105(A) and (B) provide that a lawyer may not accept or continue employment by a client if the lawyer's "independent professional judgment in behalf of [another] client will be or is likely to be adversely affected . . . or if it would be likely to involve [the lawyer] in representing differing interests," which are defined as including "every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest." See also EC 5-1. The rule permits the affected lawyer to proceed with the representation, subject to certain limitations, if the consent of the affected clients is obtained. This rule applies, however, only when one lawyer or firm has two or more clients whose interests differ or conflict, that is, the rules prevent a lawyer from taking action on behalf of one client that is contrary to the interests of another client. That the matters are unrelated is immaterial.

The second model bars the representation of a client if the lawyer's independent professional judgment on behalf of the client will be affected by the lawyer's own personal or business interests. Under DR 5-101(A), a lawyer may not accept "employment if the exercise of his independent professional judgment on behalf of his client may be affected by his own financial, business, property or personal interests." This rule is designed to protect a single attorney-client relationship from being adversely affected by, broadly speaking, the personal interests of the lawyer. For example, a lawyer may not, without properly obtaining his or her client's consent after full disclosure, initiate a substantial lawsuit on behalf of the client against a corporation in which the lawyer had made what to him or her was a major personal investment. There, the presumed risk would be that the lawyer would have an interest in repressing his or her zealousness on behalf of the client to avoid jeopardizing a personal investment.

For the reasons set forth below, we conclude that only the second model is appropriately applied to the lawyer-adversary relationship.

Prior Ethics Committee Opinions

The ethical issues posed by a lawyer's retention of adversary counsel have been addressed mainly in a handful of ethics committee opinions. n3 The discussion below will focus on those opinions.>FTNT>

n3 See also *Zuck v. Alabama*, 588 F.2d 436, 439-40 (5th Cir. 1979), cert. denied, 444 U.S. 833 (1979), the court held that a criminal defendant had been denied the effective assistance of counsel because his defense attorneys represented the prosecutor in an unrelated matter. Voicing the concern that "the defense attorneys were subject to the encumbrance that the prosecutor might take umbrage at a vigorous defense of Zuck and dispense with the services of their firm," a conflict that "could conceivably have infected the entire trial," the court ruled that the defendant's Sixth Amendment rights had been violated. For comprehensive discussions of this subject, see Steven C. Krane, When Lawyers Represent Their Adversaries: Conflicts of Interest Arising Out of the Lawyer-Lawyer Relationship, 23 *Hofstra L. Rev.* 791 (1995); Arthur Garwin, When Lawyers Need Lawyers, A.B.A. J., Mar. 1994, at 97; Brian J. Redding, Potential Conflicts Resulting From One Law Firm Representing Another, ALAS Loss Prevention J., Jan. 1996, at 5-10.>ENDFN>

In 1939, this Committee issued what seems to have been the first opinion to confront the issue. N.Y. City 502 (1939) dealt with a situation in which, during the conduct of a litigation, the inquiring lawyer had become acquainted with the attorney representing the adversary. The adversary expressed interest in hiring the inquirer to perform legal services on behalf of the adversary's clients, including arguing motions and preparing briefs. The inquirer wanted to accept this offer and to enter into the proposed arrangement, but while continuing to represent his clients in the litigation. The Committee, citing Canon 6 of the ABA Canons of Ethics, ruled that the inquirer could not accept employment from his adversary even if all affected clients gave their consent.

N.Y. City 502 therefore purported to create a per se ban against lawyers accepting employment from adversary counsel. In doing so, however, the Committee failed to cite N.Y. City 307 (1934), a prior opinion in which it had reached a conflicting conclusion. In Opinion 307, the inquiring lawyer had retained counsel in Chicago to assist in the prosecution of certain claims of his clients. Defense counsel in that case asked the inquirer whether he would be willing to handle some unrelated matters in New York. The Committee, citing no authority, held that the arrangement presented a consentable conflict. See also Michigan Inf. CI-649 (1981) (lawyer could not accept a representation of another client in a divorce action in which his lawyer-client represented the adversary, even with client consent).

At the other extreme are opinions such as Iowa 92-28 (1993), which found no impropriety whatsoever in the proposed representation of an adversary: "the mere fact that lawyers involved have been adversaries in other, non-related litigation should not affect their professional responsibilities or conduct. It is the opinion of this committee that there is no impropriety in this proposed representation." Accord Philadelphia 86-45 (committee viewed the matter as one of client relations, not of ethics, and "suggested to inquirer that he might wish to disclose the situation to his client (or the client's legal representative) to avoid any potential embarrassment should the matter be raised otherwise"); Maryland Inf. 82-4 (1981) ("the fact that you represented a fellow member of the bar in a legal malpractice action does not necessarily mean that your firm and your client-attorney may not represent clients who have opposing interests in an unrelated matter"). n4>FTNT>

n4 See also California Rules of Professional Conduct, Rule 3-320 ("[a] member [of the California State Bar] shall not represent a client in a matter in which another party's lawyer is a . . . client of the member . . . unless the member informs the client in writing of the relationship" (emphasis supplied)).>ENDFN>

We have considered and reject the reasoning of N.Y. State 579 (1987), which permitted representation of an adversary only when there was no conceivable conflict, and then only with client consent. To its credit, the New York State Committee rejected -- at least facially -- the per se approach of N.Y. City 502 and concluded that a lawyer (Attorney A) could agree to represent an adversary (Attorney B) in a personal and unrelated matter provided all of the clients involved in the litigation gave their consent. It did so, however, on the basis of a rule purely of the Committee's own construction:

It is the view of this Committee that the Code does not mandate a per se disqualification. In the first instance, both Attorney A and Attorney B must satisfy themselves that the creation of an attorney-client relationship between them will not compromise in any way the representation of their existing clients in the pending litigation in which they represent adverse parties. If there is doubt in the mind of either attorney that the dual representation by Attorney A might affect any settlement recommendation, litigation strategy or other professional judgments either attorney might be called upon to make on behalf of those existing clients, then Attorney A should decline the proffered employment. If, on the other hand, both attorneys are confident that representation of their existing clients will not be compromised in any manner by Attorney A's acceptance of Attorney B as a client in an unrelated matter and if the existing clients in the pending litigation both give their informed consent to the dual representation following full disclosure, then Attorney A may properly accept employment by Attorney B.

(Emphasis supplied.)

While the opinion cites both DR 5-101 and DR 5-105, it never states which -- if either -- provision applies to Attorney A (or to

Attorney B, for that matter). In fact, the Committee applied neither 5-101 nor 5-105, and instead devised the following test: whether the arrangement will "compromise in any way the representation of their existing clients in the pending litigation in which they represent adverse parties." N.Y. State 579 proceeds to require client consent even if "both attorneys are confident that representation of their existing clients will not be compromised in any manner . . . ." This requirement is not justified by any provision of the Code. In reality, it is contrary to DRs 5-101 and 5-105, the very provisions upon which it purports to be predicated. DR 5-101(A), the provision that rightfully applies, requires client consent only when a lawyer's professional judgment on behalf of a client will be, or reasonably may be, affected by the lawyer's own interests. If the standard of N.Y. State 579 is satisfied, that is, the representation of both clients "will not be compromised in any manner," DR 5-101(A) has not even been violated, and there is no conflict for any client to waive.

Similarly, if the representation of the clients in question "will not be compromised in any manner" by the proposed retention of adversary counsel, it cannot be the case that the independent professional judgment of the lawyers "will be or is likely to be adversely affected," nor would either lawyer be involved in representing an interest that "will adversely affect either the judgment or the loyalty of [the] lawyer to a client." Hence, if N.Y. State 579's synthetic standard is satisfied, DR 5-105 has not been violated either, and again there is no conflict for any client to waive.

It is therefore difficult to determine exactly what N.Y. State 579 means. The Committee requires the lawyer to decline the proffered representation of adversary counsel if there is any doubt in either attorney's mind that the representation of their existing clients in the pending litigation in which they represent adverse parties could be compromised in any way. The opinion, in effect, creates a substantially lower threshold for disqualification in cases of attorney-adversary representations by purporting to prohibit such representations outright if either attorney has lingering "doubts." Because indecision alone mandates disqualification without any provision for cure through informed client consent, N.Y. State 579 purports to apply a per se standard remarkably higher than that required by the New York Code of Professional Responsibility. Thus, N.Y. State 579 not only created an ad hoc standard for cases of lawyer-adversary retention, it purported to impose an enhanced and unprecedented burden on lawyers: to obtain the consent of their clients to a proposed representation even in the absence of a conflict of interest. n5>FTNT>

n5 Nassau County (New York) Opinion 2/88 held that consent was required in similar circumstances because of the "appearance of impropriety" language in Canon 9 of the Code. N.Y. State 579, released several months earlier, was not cited. It is generally recognized, however, that unless the proceedings are likely to be tainted "'appearance of impropriety is simply too slender a reed on which to rest a disqualification order.'" *Lopez v. Precision Papers, Inc.*, 99 A.D.2d 507, 470 N.Y.S.2d 678 (2d Dep't 1984) (quoting *Board of Educ. v. Nyquist*, 590 F.2d 1241, 1247 (2d Cir. 1979)); see generally 1 G. Hazard & W. Hodes, The Law of Lawyering ❖ 1.9:107 (2d ed. 1990). Likewise, Nebraska Advisory Opinion 93-1, citing N.Y. State 579, held "that an attorney may represent another attorney while opposing that attorney in pending litigation only in limited circumstances," and that full disclosure and consent from the client in the affected litigation was a prerequisite. (Ultimately, the Nebraska Committee ruled that the inquiring lawyer, who was serving as guardian ad litem for numerous children, was not in the position of an attorney at all, but was deemed to be a parent under the law.)>ENDFN>

New Jersey similarly embraced a rigid approach and branded as unethical per se a lawyer's representation in a personal injury matter of a client/attorney who was also the lawyer's adversary in an unrelated contract case, notwithstanding the fact that both clients in the contract case had consented after full disclosure. New Jersey 678 (1994). Conceding that the representation would not be improper under the conventional conflict of interest rules embodied in Rules 1.7(a) and (b) of the Model Rules of Professional Conduct, the Committee relied solely upon the New Jersey ethics rule barring representations "in certain cases or situations creating an appearance of impropriety rather than an actual conflict . . . ." n6 Specifically, the Committee felt that the public might conclude "that the inquiring attorney or the client/attorney may obtain unfair advantages and that the inquiring attorney may, in some manner, suppress vigorous representation to preserve his relationship with his client/attorney . . . ." Notably, within eight months the New Jersey Committee had retreated from this position. In New Jersey 679 (1995), which superseded its prior opinion, the Committee allowed that in appropriate circumstances client consent could cure the conflict. Nevertheless, the Committee reiterated its view that "the proposed representation of opposing counsel in another matter raises a particularly sensitive circumstance, which an ordinary knowledgeable citizen could easily conclude to be improper.">FTNT>

n6 New Jersey Rules of Professional Conduct, Rule 1.7(c)(2) ("in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients."). The "appearance of impropriety" standard, which was contained in Canon 9 of the Model Code of Professional Responsibility, was specifically rejected by the ABA in its Model Rules of Professional Conduct. See Model Rules of Professional Conduct, Rule 1.9, Comment (disqualification should be based on a "functional analysis," not the "very general concept" of the "appearance of impropriety").>ENDFN>

Analysis of Governing Standards

The principal observation that can be made based on the foregoing review of the authorities that have grappled with the conflict of interest issues in the adversary-client context is that there is no agreement as to either the identity of the proper standard or the

manner in which it should be applied. We believe that analysis of tangible fact, and not rigid formalism, is the only sensible method for resolving these matters. Each situation must be evaluated independently in light of its peculiar circumstances. Notwithstanding the appearance of clarity and neatness, and thus the attractiveness, of bright-line rules, their inherent inflexibility is unjustified in the absence of recurring facts and palpable guideposts. A fortiori, when a determination must be made based on an interrelated series of judgments and predictions, a bright-line rule is ineffectual.

As noted above, we are of the view that the situation presented here must be analyzed under DR 5-101, not DR 5-105. C is contemplating entering into an attorney-client relationship with L, who is representing an adverse party in an unrelated litigation C is handling for a client. Because C is not taking on a new client, there can be no concern that his independent professional judgment on behalf of a client will be adversely affected by his representation of another client, as under DR 5-105. Thus, DR 5-101(A) would bar C from continuing to represent his client (absent the client's informed consent) only if the exercise of his independent professional judgment on behalf of the client will be or reasonably may be affected by his own financial, business, property or personal interests. C would have no reason to soft-pedal his representation of his client, however, unless he reasonably believed that L would be a less effective lawyer on his behalf if he were an aggressive advocate. The risks are interrelated, and cannot be assessed without some evaluation of the specific facts of each individual case.

At the same time, L cannot agree to represent C unless she, too, resolves any conflict of interest problems she may have. L's financial or business interests theoretically could impinge upon her independent professional judgment on behalf of C if, for example, her interest in preserving the income stream from C is of a sufficient magnitude that she is tempted to be less aggressive in the course of her representation of her client in order to avoid offending C. This risk may be significant, or it may not. The key assessment is whether the materiality to L of the income stream from her representation of C so substantially exceeds the importance of the L's relationship with her client that the enticement will exist for L to violate her ethical duties to the latter. This is not simply an accounting question, but is dependent upon a variety of factors relating to the scope and duration of the attorney-client relationships and the functions being performed by L for her respective clients.

Thus, it is the connection between the two lawyers that is viewed as the potential contaminant in the pre-existing attorney-client relationships. Several factors, suggested in whole or in part by the ethics committee opinions discussed above, should be taken into account in judging whether the risk of contamination is sufficiently great as to require the consent of the clients to the proposed lawyer-lawyer representation: (a) the intensity and duration of the relationship between the adversaries; (b) the intensity and duration of the adversaries' relationships with their respective clients; (c) the nature of the lawyer-lawyer representation; (d) the nature of the work currently being performed by the lawyers for their respective clients; (e) the relationship, if any, between the lawyer-lawyer representation and the representation of either client; and (f) the relative importance of the representations to the respective lawyers or firms.

None of these factors should be dispositive; they are not set forth in order of relative importance. They are a means by which an objective viewer can divine the tangibility of a sufficient risk to the representation of an existing client to justify disclosing the lawyer-lawyer affiliation to the clients and conditioning that affiliation upon securing client consent.

Thus, L may undertake the representation of C without having to consult and obtain the consent of her preexisting client. It is important to bear in mind that, under the applicable rules, even if L reasonably concluded that she did have a business or professional interest that conflicted with her duty to C, the only client that would have to consent would be C himself, and not C's client. DR 5-101(A) only requires consent of the client whose representation is likely to be adversely affected. The client presumptively favored has no right, and no reason, to veto the lawyer-lawyer relationship.

From C's perspective, the situation is not substantially different. C is perfectly capable of reaching the conclusion that the only client realistically at risk of having a less-than-zealous representation is himself. Any thought that C's aggressive prosecution of his client's claims against L's client is likely to be dampened by her desire not to offend L and risk having a substandard representation cannot and should not be presumed, particularly if counterbalanced by a long-standing and important professional relationship between C and his client. Thus, in the absence of objective facts indicating that L is likely to represent C with less vigor if he is too contentious in his dealings with L, C need not seek his client's consent to his retention of L.

It would be impossible to attempt to address every conceivable combination of factors and their implications under the conflict of interest rules. Viewed objectively, there will be circumstances in which it is clear that there is no conflict of interest for either lawyer, circumstances in which it is clear that both lawyers have a conflict of interest (requiring consent of both clients after full disclosure), and gradations in between. Consider the following two hypothetical scenarios, which we offer as examples of the extremes:

Scenario A. Lawyer A is a partner in a 500-attorney global law firm, working in the firm's New York office. She is asked to undertake the representation of Client X in a potential action against Y, a California-based company, which failed to pay for a small shipment of goods. On behalf of Client X, Lawyer A writes a demand letter to Y, and receives a response from Y's newly retained attorney, who in turn is being represented in a personal real estate transaction by Lawyer B, an associate in the Los Angeles office of Lawyer A's firm. Lawyer A and Lawyer B have never met or spoken to one another. The amount of the fee to be generated by the Los Angeles real estate matter is immaterial to the firm. In these circumstances, it is inconceivable that the independent

professional judgment of Lawyer A on behalf of Client X will be diminished by virtue of the fact that the attorney for X's adversary is being represented in an unrelated transaction by her firm. There is, consequently, no conflict of interest under DR 5-101(A) and no need for the firm to seek Client X's consent to the continued representation.

Scenario B. Lawyer P, a solo practitioner, has been representing his life-long friend and former partner, Lawyer Q, in a hotly contested divorce proceeding for the past year. Although Lawyer P is charging Q a reduced rate for his services, the fees P is receiving from Q constitute approximately 10% of his income. P is asked to undertake an ongoing medical malpractice action against a doctor who is being represented in the litigation by Q. The plaintiff in the malpractice action, P's potential client, fired his prior attorney because he refused to seek the imposition of sanctions against Lawyer Q. Here, given the personal and financial relationship between P and Q, it is difficult to see how P's independent professional judgment on behalf of the malpractice plaintiff would not be adversely affected. Indeed, this may be so severe a conflict that consent would not be effective. Although DR 5-101(A) speaks only of obtaining consent after full disclosure, without any limitation whatsoever, that provision, at least in New York, has been interpreted in a manner that engrafts upon it the limitation on consentability contained in DR 5-105(C), that is, it must be "obvious that [the lawyer] can adequately represent the interests of each [client]." n7 Nonconsentability, however, must be limited to the most extreme of conflicts, those in connection with which an objective lawyer would urge the client to withhold consent.>FTNT>

n7 As the New York State Bar Association Committee on Professional Ethics stated in its Opinion 635 (1992) (citing N.Y. State 595 (1988)):

While DR 5-101(A) provides that a client may consent to representation by a lawyer whose financial, business, property or personal interests differ from those of the client, thereby waiving the conflict of interest, consent is ineffective if there is a reasonable probability (viewed objectively) that the lawyer's interests will affect adversely the advice to be given or the services to be rendered to the client.

>ENDFN>

In between these extremes, a lawyer seeking to undertake or continue representation of an adversary attorney should give serious consideration to advising the client of the relationship, even if the lawyer reasonably concludes that consent is not required in the circumstances. Doing so would be consistent not only with the precepts that selection of counsel should be made on an informed basis, see EC 2-8, and that attorneys should provide clients with sufficient information to permit them to make informed decisions regarding the representation, see EC 7-8, but with the ethical objectives toward which every member of the profession should strive.

CONCLUSION

Subject to the limitations and caveats expressed in the foregoing discussion, the questions presented are answered in the affirmative.